# OLMFREDER SEVERTSON v. NORTHERN PACIFIC RAILWAY COMPANY, a Corporation.

## (155 N. W. 11.)

**Facts disputed — jury trial — directed verdict — railway company — street crossing — city — accident — stopping of trains — sidewalk.**

1. It is error to take a case from the jury and to direct the verdict for the defendant where, though the facts are seriously disputed, there is evidence to show that a railway train was stopped on or immediately before a street crossing in a city, and that plaintiff's intestate, an old man, immediately before said accident, was seen struggling in the middle of the track a short distance in front of the engine, and either on the sidewalk which crossed the track or some 7 or 8 feet beyond it, and that, after he began to so struggle, the railway company started its engine and the cars thereto attached, and ran over said deceased.

**Railway company — stopping of trains — on public street — city — starting trains — warning before.**

2. A railway company has no right, when it stops a train upon a public street of a city, to start it without giving ample warning and acquainting itself of the fact as to whether or not there are travelers upon said street or at or near said crossing who may be in danger.

**Contributory negligence — question of fact — for jury — railroad crossing — pedestrian attempting to cross — train standing still — starting.**

3. It is a matter of fact for the jury, and not of law for the court, to decide whether a traveler upon a public street of a city is guilty of contributory negligence who attempts to cross a railroad track behind and south of a freight or gondola car attached to an engine pointing away from him, and with several cars north and attached thereto, and when such engine or train of cars is standing still either on or near said crossing, and there are no gates or flagmen at the same.

Opinion filed November 30, 1915.

Appeal from the District Court of Walsh County, *Kneeshaw*, J. Action to recover damages for personal injuries by wrongful act. Judgment for defendant. Plaintiff appeals.

Reversed.

*M. A. Hildreth* and *H. C. De Puy,* for appellant.

Where the facts as to the acts which it is contended constitute con-

tributory negligence are in dispute, the question is one for the jury, and it is error for the court to take such a case from the jury, or to direct a verdict. Rober v. Northern P. R. Co. 25 N. D. 394, 142 N. W. 22; McNamara v. New York C. & H. R. R. Co. 136 N. Y. 650, 32 N. E. 765; Wilson v. Southern P. R. Co. 62 Cal. 164; Painton v. Northern C. R. Co. 83 N. Y. 8; 2 Thomp. Neg. §§ 1697, 1699, 1700; Patterson, Railway Acci. Law, p. 156, cases cited in foot notes; Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 377, 121 N. W. 830; Johnson v. Great Northern R. Co. 12 N. D. 420, 97 N. W. 546; Braun v. Buffalo General Electric Co. 200 N. Y. 495, 34 L.R.A. (N.S.) 1089, 140 Am. St. Rep. 645, 94 N. E. 206, 21 Ann. Cas. 370; Richmond & D. R. Co. v. Powers, 149 U. S. 43, 44, 37 L. ed. 642, 643, 13 Sup. Ct. Rep. 748, 7 Am. Neg. Cas. 369.

The doctrine of the last clear chance is the settled law of this jurisdiction. Welsh v. Fargo & M. Street R. Co. 24 N. D. 463, 140 N. W. 683; and cases cited.

Contributory negligence is no defense, if the defendant railway company, by the exercise of ordinary care, could have discovered that deceased was in a position of peril in time to have averted the accident. Harrington v. Los Angeles R. Co. 140 Cal. 514, 63 L.R.A. 238, 98 Am. St. Rep. 85, 74 Pac. 15; Thompson v. Salt Lake Rapid Transit Co. 16 Utah, 281, 40 L.R.A. 172, 67 Am. St. Rep. 621, 52 Pac. 92; Baltimore Consol. R. Co. v. Rifcowitz, 89 Md. 338, 43 Atl. 762; Hart v. Cedar Rapids & M. City R. Co. 109 Iowa, 631, 80 N. W. 662; Miller v. Cedar Rapids Sash & Door Co. 153 Iowa, 735, 134 N. W. 411; Ramsey v. Cedar Rapids & M. C. R. Co. 135 Iowa, 329, 112 N. W. 798; Murray v. St. Louis Transit Co. 108 Mo. App. 501, 83 S. W. 995; St. Louis S. W. R. Co. v. Thompson, 89 Ark. 496, 117 S. W. 541; 2 Thomp. Neg. 1476; Costello v. Third Ave. R. Co. 161 N. Y. 317, 55 N. E. 897; Bittner v. Crosstown Street R. Co. 153 N. Y. 76, 60 Am. St. Rep. 588, 46 N. E. 1044, 1 Am. Neg. Rep. 642; Wasmer v. Delaware, L. & W. R. Co. 80 N. Y. 212, 36 Am. Rep. 608; Silliman v. Lewis, 49 N. Y. 379; Austin v. New Jersey S. B. Co. 43 N. Y. 75, 3 Am. Rep. 663; Haley v. Earle, 30 N. Y. 208; Weitzman v. Nassau Electric R. Co. 33 App. Div. 585, 53 N. Y. Supp. 905; McKeon v. Steinway R. Co. 20 App. Div. 601, 47 N. Y. Supp. 374; Bump v. New York, N. H. & H. R. Co. 38 App. Div. 60, 55 N. Y. Supp. 962.

affirmed in 165 N. Y. 636, 59 N. E. 1119; Kenyon v. New York C. & H. R. R. Co. 5 Hun, 479; Radley v. London & N. W. R. Co. L. R. 1 App. Cas. 754, 46 L. J. Exch. N. S. 573, 35 L. T. N. S. 637, 25 Week. Rep. 147; Davies v. Mann, 10 Mees. & W. 546, 12 L. J. Exch. N. S. 10, 6 Jur. 954, 19 Eng. Rul. Cas. 190; Isbele v. New York & N. H. R. Co. 27 Conn. 393, 71 Am. Dec. 78; Trow v. Vermont C. R. Co. 24 Vt. 487, 58 Am. Dec. 191; Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 35 L. ed. 270, 11 Sup. Ct. Rep. 653; Grand Trunk R. Co. v. Ives, 144 U. S. 408, 36 L. ed. 485, 12 Sup. Ct. Rep. 679, 12 Am. Neg. Cas. 659; 1 Shearm. & Redf. Neg. 5th ed. § 99; Patterson, Railway Acci. Law, § 58; Acton v. Fargo & M. Street R. Co. 20 N. D. 435, 129 N. W. 225.

It is the duty of courts, when a motion for directed verdict is made, to give a construction to the evidence most favorable to the opposite party. Warnken v. Langdon Mercantile Co. 8 N. D. 243, 77 N. W. 1000; Bohl v. Dell Rapids, 15 S. D. 619, 91 N. W. 315; Marshall v. Harney Peak Tin Min. Mill. & Mfg. Co. 1 S. D. 350, 47 N. W. 290; Merchants' Nat. Bank v. Stebbins, 15 S. D. 280, 89 N. W. 674; John Miller Co. v. Klovstad, 14 N. D. 435, 105 N. W. 164; Ernster v. Christianson, 24 S. D. 103, 123 N. W. 711.

Photographs may be used in evidence, subject to explanation of conditions found after an accident, if taken at or shortly after the accident. Sherlock v. Minneapolis, St. P. & S. Ste. M. R. Co. 24 N. D. 40, 138 N. W. 976.

It is not an absolute duty that a traveler should look and listen for an approaching train. Johnson v. Seaboard Air Line R. Co. 163 N. C. 431, 79 S. E. 690, Ann. Cas. 1915B, 598, 4 N. C. C. A. 627.

It is the duty of a railway company to guard the rear end of its train while being moved over the street crossings in a city, and it is neglect of duty not to do so, and where such failure is the proximate cause of an accident or injury, then the question is for the jury. Cameron v. Great Northern R. Co. 8 N. D. 125, 77 N. W. 1016, 5 Am. Neg. Rep. 454; Coulter v. Great Northern R. Co. 5 N. D. 568, 67 N. W. 1046.

*Watson & Young* and *E. T. Conmy,* for respondent.

There was a total failure of proof to sustain the allegations of the complaint, and plaintiff was properly nonsuited. A railroad company

should not be held liable for injury occurring at a defective point in a sidewalk some distance from the street crossing. Rev. Codes 1905, § 3324; Lynch v. Cleveland, C. C. & St. L. R. Co. 20 Ohio C. C. 248, 11 Ohio C. D. 243.

Neither is a railroad company liable for an injury resulting from its crossing being out of repair, unless it had notice of such fact, or the defect existed a sufficient length of time to justify the presumption of notice. Mann v. Chicago, R. I. & P. R. Co. 86 Mo. 348; Nixon v. Hannibal & St. J. R. Co. 141 Mo. 425, 42 S. W. 945; 38 Cyc. "Trial" 1547; 19 Decen. Dig. "Trial," § 159; Cooke v. Northern P. R. Co. 22 N. D. 266, 133 N. W. 303; Woodward v. Northern P. R. Co. 16 N. D. 38, 111 N. W. 627.

Plaintiff's intestate was guilty of contributory negligence. A pedestrian approaching a railway track is held to a strict duty to ascertain if there are any trains coming, before going on the track. Kallmerten v. Cowen, 49 C. C. A. 346, 111 Fed. 297; Korrady v. Lake Shore & M. S. R. Co. 131 Ind. 261, 29 N. E. 1070; Young v. Old Colony R. Co. 156 Mass. 178, 30 N. E. 560; Chicago, R. I. & P. R. Co. v. Houston, 95 U. S. 702, 24 L. ed. 542, 7 Am. Neg. Cas. 345; Watson v. Mound City Street R. Co. 133 Mo. 246, 34 S. W. 573; Hansen v. Chicago, M. & St. P. R. Co. 83 Wis. 631, 53 N. W. 910; Wendell v. New York C. & H. R. R. Co. 91 N. Y. 428; 3 Elliott, Railroads, pp. 342, 343, also § 1168; Northern P. R. Co. v. Freeman, 174 U. S. 379, 43 L. ed. 1014, 19 Sup. Ct. Rep. 763; Wabash R. Co. v. Tippecanoe Loan & T. Co. 178 Ind. 113, 38 L.R.A.(N.S.) 1167, 98 N. E. 64; Sherlock v. Minneapolis, St. P. & S. Ste. M. R. Co. 24 N. D. 40, 138 N. W. 976.

Where negligence is claimed, it must be shown that it was the proximate cause of the injury. Voehl v. Delaware, L. & W. R. Co. — N. J. —, 59 Atl. 1034.

A question of fact of which there is no evidence cannot be submitted to the jury. Schneider v. Pennsylvania Co. 1 Sadler (Pa.) 290, 3 Atl. 26; Baltimore & O. R. Co. v. Anderson, 22 C. C. A. 415, 43 U. S. App. 673, 75 Fed. 811; Shearm. & Redf. Neg. § 57.

The doctrine of last clear chance has no application under the facts as they appear here. This is not a case of wilful injury or one where

the company has failed to exercise reasonable care, after the discovery of a traveler on or about to cross its tracks. 3 Elliott, Railroads, § 1175.

Where the negligence is concurrent, and not wilful, or the result of lack of reasonable care, contributory negligence is a defense. Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 35 L. ed. 270, 11 Sup. Ct. Rep. 653; Grand Trunk R. Co. v. Ives, 144 U. S. 408, 36 L. ed. 485, 12 Sup. Ct. Rep. 679, 12 Am. Neg. Cas. 659; Sweeney v. New York Steam Co. 117 N. Y. 642, 22 N. E. 1131; Baltimore & O. R. Co. v. Hellenthal, 31 C. C. A. 414, 60 U. S. App. 156, 88 Fed. 116; Dunworth v. Grand Trunk Western R. Co. 62 C. C. A. 225, 127 Fed. 307; Louisville & N. R. Co. v. East Tennessee, V. & G. R. Co. 9 C. C. A. 314, 22 U. S. App. 102, 60 Fed. 993; Gilbert v. Erie R. Co. 38 C. C. A. 408, 97 Fed. 747; Missouri P. R. Co. v. Moseley, 6 C. C. A. 641, 12 U. S. App. 601, 57 Fed. 921; Denver & B. P. Rapid Transit Co. v. Dwyer, 20 Colo. 132, 36 Pac. 1106; Johnson v. Baltimore & P. R. Co. 6 Mackey, 232; Richmond & D. R. Co. v. Didzoneit, 1 App. D. C. 482; Cullen v. Baltimore & P. R. Co. 8 App. D. C. 69; Murphy v. Deane, 101 Mass. 455, 3 Am. Rep. 390; Bouwmeester v. Grand Rapids & I. R. Co. 63 Mich. 557, 30 N. W. 337; Denman v. St. Paul & D. R. Co. 26 Minn. 357, 4 N. W. 605; Mobile & O. R. Co. v. Roberts, —Miss. —, 23 So. 393; Isabel v. Hannibal & St. J. R. Co. 60 Mo. 475; Zimmerman v. Hannibal & St. J. R. Co. 71 Mo. 477; Yarnall v. St. Louis, K. C. & N. R. Co. 75 Mo. 575; Union P. R. Co. v. Mertes, 35 Neb. 204, 52 N. W. 1099; Valin v. Milwaukee & N. R. Co. 82 Wis. 1, 33 Am. St. Rep. 17, 51 N. W. 1084; Little v. Superior Rapid Transit R. Co. 88 Wis. 402, 60 N. W. 705; Philadelphia & R. R. Co. v. Hummell, 44 Pa. 375, 84 Am. Dec. 457; Cincinnati, H. & D. R. Co. v. Kassen, 49 Ohio St. 230, 16 L.R.A. 674, 31 N. E. 282, 6 Am. Neg. Cas. 179; Neet v. Burlington, C. R. & N. R. Co. 106 Iowa, 248, 76 N. W. 677, 5 Am. Neg. Rep. 26; Dyerson v. Union P. R. Co. 74 Kan. 528, 7 L.R.A.(N.S.) 132, 87 Pac. 680, 11 Ann. Cas. 207; Hope v. Great Northern R. Co. 19 N. D. 438, 122 N. W. 997; Gast v. Northern P. R. Co. 28 N. D. 118, 147 N. W. 793; Dunworth v. Grand Trunk Western R. Co. 62 C. C. A. 225, 127 Fed. 307; Illinois C. R. Co. v. Ackerman, 76 C. C. A. 13, 144 Fed. 959, 20 Am. Neg. Rep. 248; Boyd v. Southern R. Co. 115 Va. 11, 78 S. E. 548, Ann. Cas. 1914D, 1017; Burnett v. Atchison, T. &

S. F. R. Co. 172 Mo. App. 51, 154 S. W. 1135; Graf v. Chicago & N. W. R. Co. 94 Mich. 579, 54 N. W. 389; Powers v. Iowa C. R. Co. 157 Iowa, 347, 136 N. W. 1049; Morton v. Southern R. Co. 112 Va. 398, 71 S. E. 561; Wilson v. Illinois C. R. Co. 150 Iowa, 33, 34 L.R.A.(N.S.) 687, 129 N. W. 340.

A railroad company owes to a trespasser only the duty to refrain from wilfully and wantonly injuring him after his peril has been discovered. O'Leary v. Brooks Elevator Co. 7 N. D. 554, 41 L.R.A. 677, 75 N. W. 919, 4 Am. Neg. Rep. 451; Cumming v. Great Northern R. Co. 15 N. D. 611, 108 N. W. 798; Wright v. Minneapolis, St. P. & S. Ste. M. R. Co. 12 N. D. 159, 96 N. W. 324; McDonald v. Minneapolis, St. P. & S. Ste. M. R. Co. 17 N. D. 606, 118 N. W. 819; Corbett v. Great Northern R. Co. 19 N. D. 450, 125 N. W. 1054; Clair v. Northern P. R. Co. 22 N. D. 120, 132 N. W. 776; Reinke v. Minneapolis, St. P. & S. Ste. M. R. Co. 23 N. D. 182, 135 N. W. 779; New York, N. H. & H. R. Co. v. Kelly, 35 C. C. A. 571, 93 Fed. 745; Craig v. Mount Carbon Co. 45 Fed. 448; Illinois C. R. Co. v. Arnola, 78 Miss. 787, 84 Am. St. Rep. 645, 29 So. 768; Christian v. Illinois C. R. Co. 71 Miss. 237, 15 So. 71; Barker v. Hannibal & St. J. R. Co. 98 Mo. 50, 11 S. W. 254; Riley v. Missouri P. R. Co. 68 Mo. App. 652; Egan v. Montana C. R. Co. 24 Mont. 569, 63 Pac. 831; Anderson v. Chicago, St. P. M. & O. R. Co. 87 Wis. 195, 23 L.R.A. 203, 58 N. W. 79; Louisiana Western Extension R. Co. v. McDonald, — Tex. Civ. App. —, 52 S. W. 649; Ward v. Southern P. Co. 25 Or. 433, 23 L.R.A. 715, 36 Pac. 166; McMallen v. Pennsylvania R. Co. 132 Pa. 107, 19 Am. St. Rep. 591, 19 Atl. 27; Terry v. New York C. R. Co. 22 Barb. 574; Camden, G. & W. R. Co. v. Young, 69 N. J. L. 193, 37 Atl. 1013, 3 Am. Neg. Rep. 436; State Use of Ricketts v. Baltimore & O. R. Co. 69 Md. 494, 9 Am. St. Rep. 436, 16 Atl. 210; Tennis v. Inter-State Consol. Rapid Transit R. Co. 45 Kan. 503, 25 Pac. 876; Thomas v. Chicago, M. & St. P. R. Co. 114 Iowa, 169, 86 N. W. 259; Birmingham R. Light & P. Co. v. Jones, 153 Ala. 157, 45 So. 177.

Where the accident might have happened in several different ways, plaintiff must show by a preponderance of the evidence that it happened in a way for which defendant is liable. Meehan v. Great Northern R. Co. 13 N. D. 443, 101 N. W. 183; Garraghty v. Hartstein, 26 N. D. 148, 43 N. W. 390; Kern v. Snider, 76 C. C. A. 201, 145 Fed.

327; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000; Balding v. Andrews, 12 N. D. 267, 96 N. W. 305, 14 Am. Neg. Rep. 615; Koslowski v. Thayer, 66 Minn. 150, 68 N. W. 973; Yaggle v. Allen, 24 App. Div. 594, 48 N. Y. Supp. 827; Chesapeake & O. R. Co. v. Heath, 103 Va. 64, 48 S. E. 508; Consumers' Brewing Co. v. Doyle, 102 Va. 399, 46 S. E. 390; Dobbins v. Brown, 119 N. Y. 188, 23 N. E. 537; Kenneson v. West End Street R. Co. 168 Mass. 1, 46 N. E. 114, 1 Am. Neg. Rep. 446; Kemp v. Northern P. R. Co. 89 Minn. 139, 94 N. W. 439.

It is the general rule, where the evidence as to negligence is in conflict, that a scintilla of evidence is not sufficient to carry the case to the jury. Fuller v. Northern P. Elevator Co. 2 N. D. 220, 50 N. W. 359; Duncan v. Great Northern R. Co. 17 N. D. 610, 19 L.R.A. (N.S.) 952, 118 N. W. 826; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000; Garraghty v. Hartstein, 26 N. D. 148, 143 N. W. 390; Chesapeake & O. R. Co. v. Stock, 104 Va. 97, 51 S. E. 161; McDonald v. Cole, 46 W. Va. 186, 32 S. E. 1033.

It is a question of law for the court as to whether or not there is any legal evidence in the case to submit to the jury, or whether such evidence could sustain a verdict, if given. Bowman v. Eppinger, 1 N. D. 25, 44 N. W. 1000; Finney v. Northern P. R. Co. 3 Dak. 270, 16 N. W. 500; People v. Cook, 8 N. Y. 67, 59 Am. Dec. 451; Kelsey v. Northern Light Oil Co. 45 N. Y. 509, 13 Mor. Min. Rep. 497; Neuendorff v. World Mut. L. Ins. Co. 69 N. Y. 389; Baulic v. New York & H. R. Co. 59 N. Y. 365, 17 Am. Rep. 325; Toomey v. London, B. & S. C. R. Co. 3 C. B. N. S. 146, 27 L. J. C. P. N. S. 39, 6 Week. Rep. 44; Hyatt v. Johnston, 91 Pa. 200; Pleasants v. Fant, 22 Wall. 120, 22 L. ed. 782; Griggs v. Houston, 104 U. S. 553, 26 L. ed. 840; Marion County v. Clark, 94 U. S. 284, 24 L. ed. 61; Bagley v. Bowe, 105 N. Y. 179, 59 Am. Rep. 488, 11 N. E. 386; Bulger v. Rosa, 119 N. Y. 460, 24 N. E. 853; Longley v. Daly, 1 S. D. 257, 46 N. W. 247; Marshall v. Harney Peak Tin Mill. & Mfg. Co. 1 S. D. 350, 47 N. W. 290; Peet v. Dakota F. & M. Ins. Co. 1 S. D. 462, 47 N. W. 533; Pirie v. Gillitt, 2 N. D. 255, 50 N. W. 710; Richmire v. Andrews & G. Elevator Co. 11 N. D. 453, 92 N. W. 819; Balding v. Andrews, 12 N. D. 267, 96 N. W. 305, 14 Am. Neg. Rep. 615; McMillen v. Aitchison, 3 N. D. 183, 54 N. W. 1030; Elliott v. Chicago, M. &

St. P. R. Co. 150 U. S. 245, 37 L. ed. 1068, 14 Sup. Ct. Rep. 85; Reynolds v. Great Northern R. Co. 29 L.R.A. 695, 16 C. C. A. 435, 32 U. S. App. 577, 69 Fed. 808; McKeever v. Homestake Min. Co. 10 S. D. 599, 74 N. W. 1053; Fisher v. Porter, 11 S. D. 311, 77 N. W. 112; Chicago, R. I. & P. R. Co. v. Driggers, 1 Ind. Terr. 412, 45 S. W. 124; Rollison v. Wabash R. Co. 252 Mo. 525, 160 S. W. 994.

Opinion on Rehearing.

Statement of facts.

BRUCE, J. (This opinion is written after rehearing had.) This is an appeal from a judgment which was entered on a verdict directed for the defendant company. The action is brought by a widow to recover damages for the death of her husband, which was occasioned by an accident at a railway crossing in the city of Grafton, North Dakota. The deceased, Joseph Severtson, was seventy-two years of age. He had a crippled foot, which, in walking, he raised 3 or 4 inches and kicked out to the side. The tracks of the railway company run north and south, and on the day of the accident the deceased approached the same from the west, walking along the south side of what is known as Fifth street, in the city of Grafton, with his head down and apparently, according to some witnesses, not looking for a train. The train came from the north, and his view to the north was clear and unobstructed, that is to say, from a point 47 feet from the center of the track he could see up the track 72 feet; 20 feet from the track he could see up the track 100 feet; 15 feet away he could see up the track $120\frac{1}{2}$ feet, and 10 feet away he could see up the track $169\frac{1}{2}$ feet. Forty-five feet east of the crossing there appears to have been a house track, and at the crossing two tracks, on the westerly one of which the train which occasioned the accident was running, and which train consisted of a coal car, north of which were a tender and engine, and still north of which were several box cars. This train was being backed from the north down the side track. Two witnesses, Barr, a blacksmith, and Given, a drayman, testified as to having first seen the deceased at a distance of about 8 feet from the track. Given testified that he was looking directly at the deceased from a point about 80 feet west of the

place of the accident, and while driving on Fifth street. He was thus in a position not merely to clearly see the deceased as the day was clear, and it was broad daylight, but to gauge the distance between the deceased and the approaching car, and to tell when the car started to move. He testified that he first saw the deceased a distance of 6 or 7 feet from the crossing, and at the time he was walking probably 7 or 8 feet south of the sidewalk which is constructed on the south side of Fifth street. He testified that the train was backing up the track at the rate of 3 or 4 miles an hour; that Severtson was walking with his head down; that he had a pail, a saw, and a loaf of bread; that he did not seem to pay any attention to the train; that he did not look north to see where the train was coming from; that he (Given) was approaching the crossing all the time, as he wanted to get over; that the deceased did not pay any attention to the train; that he was on the middle of the track when he was hit and about 8 or 9 feet south of the sidewalk; that immediately after the accident he (the witness) examined the crossing, and that it looked like any other crossing, and there were no holes or anything else there; that it was a nice, clear day, and that the sun was shining.

The witness Barr testified that at the time of the accident he was standing at the front door of his shop, which appears to have been about 125 feet west of the crossing, and on the north side of the street; that when he first saw the deceased the latter was about 5 or 6 feet from the crossing; that at the time the train was backing down the track at a rate of about 4 or 5 miles an hour; that he saw Severtson step onto the track and turn around and throw up his hands, and that then the train hit him; that the deceased was then in about the center of the track; that when approaching the track the deceased was walking with his head partly down; that the witness did not see him look until he got onto the track; that at the time he was struck the deceased was about 5 or 6 feet south of the south edge of the sidewalk; that the deceased had a hitch in his leg and threw it out when he walked.

One Hoag, the driver of a grocery wagon, was also a witness to the accident. He testified that at the time of the accident he was sitting on his delivery wagon, on the house track, east of the crossing, right in the middle of the crossing, and about 40 feet from where the accident occurred; that the deceased, Severtson, was coming east, that when

walking Severtson would throw out one foot and then plant the other one; that it was difficult to make Severtson hear and one had to shout pretty loud; that he examined the crossing after the accident; that he saw a few indentations on the ground,—none with reference to the planking.

One Cabots, the engineer of the train, testified that he was coming with his train from East Grand Forks and going to Pembina; that he stopped at Grafton and unloaded some freight; that after that he shoved his train over the crossing and backed it south to the Sixth street crossing; that he then cut off his engine, and went and did some switching on the mill track; that is, north of the Fifth street crossing; that his engine was facing north, and that he was on the east side of the engine; that is to say, on the right-hand side; that he had one car behind the engine and four cars ahead; that his train had not stopped from the time he left the mill spur coming south and until after the accident had occurred; that he was watching both in front and behind to see about the track; that ahead of him was a car and tender going south; that the box car and tender did not interfere with his view west of the track; that he could not see west of the track for a considerable distance over the tank of the tender; that he was looking, but he did not see a soul; that the bell was ringing as he was approaching the crossing; that his train was traveling possibly 4 or 5 miles an hour; that a train of that size traveling at the rate it was traveling could be stopped in a car length or a car and a half; that each car was 40 feet; that his brakeman, Koochenbecker, was riding on the gondola car; that there was a local freight train north of the Fourth street crossing; that it had come from the north, Pembina; that if his train was coming 1 mile an hour it would take possibly a car length to stop it; that he had been engaged in moving cars possibly twenty minutes before the accident; that he had been switching across that crossing ten minutes or perhaps fifteen; that his train had not stopped from the time he pulled back until he stopped after the accident. The record also shows that the mill spur referred to was more than a block north of the place of the accident.

The fireman, P. M. Brantl, testified that his attention was first called to the accident when he heard a farmer hollering, and when his engine was south of the Fifth street crossing; that he was sitting on his box,

32 N. D.—14.

looking south toward the crossing and toward the switch, looking both north and south; that there was the brakeman Koochenbacker on the south end of the car; that he saw him pretty close to the crossing; that he was standing on the .car end; that he was inside of the car, the gondola; that he was looking out south; that as he got up to the crossing the brakeman disappeared from his line of vision; that he did not know where he went; that it was a clear day.

The witness Bradford testified that he was a brakeman on the train; that as they pulled up to the depot as they arrived at Grafton they unloaded some freight and pulled their train up to the Fifth street crossing; that he then cut off their engine, and ran down the main line and back across the elevator track, and backed over the Fifth street crossing and coupled onto an empty gondola, and went across the Fifth street crossing to the mill track, which was more than a block to the north; that they picked up some cars at the mill track; that they were coming down off the mill track with the engine and one car behind the engine, that would be south of the engine and six cars ahead of it; that they backed up and across the said crossing, and backed up to the main line, and backed up again to clear the switch; that the train had run the length of two and one-half cars when they picked up the empty gondola car; that the gondola car was south of the Fifth street crossing about the length of a car and a half; that after that they cut off two cars and backed up a short distance to clear the switch, and that he signaled the engineer to come ahead; that the engineer did not respond, and that he afterwards found that an accident had happened; that the bell was ringing at the time; that the remains of the deceased were about 40 or 50 feet south of the crossing; that he did not see the man killed; that the train had gone about a car and a half length south of the crossing when he discovered the remains.

B. W. Barnes testified that he was the conductor of the train that came into Grafton on the day in question; that he was around seeing that the switching was done right; that one brakeman was on the rear car and the other brakeman on the car ahead of the engine; that it was a clear day.

The witness Koochenbecker testified that he was working as a brakeman on the freight train; that they arrived at Grafton at about 11:30 in the morning; that they unloaded their local freight, and backed

up off the main track; that they then went over to the elevator track to do their switching; that they went up to the mill to take on five or six cars there; that they then backed up intending to make a switch, came up and made the switch, and then the accident occurred; that he got into the gondola car at about 20 feet from the mill spur and about a block from the mill; that he got on the rear of the tender; that he got into the car and walked down the center of it, and walked towards the engine in coming out on the mill-track spur; that he was looking out to see that nobody got hurt; that he stayed in the car until they backed over the crossing; then he got out of the car on the east side of the car and from the south end; then he walked toward the engine to relay signals north across Fifth street; that the car practically stopped at the switch; that he thought it was then he saw the deceased Severtson, he could not state the exact distance, but he should judge that Severtson was about 15 feet from the passing track in a southerly direction, and that he was not on the sidewalk; there was only one girl on the sidewalk; it was a clear day; the bell was ringing on the train; that he was on the train when it passed the crossing.

The witness Shell testified that he was relief agent of the St. Hilare Lumber Company; that his attention was called to the accident by the shouting of a farmer named Jestrand; that he walked over and saw somebody was hurt; that the body was 40 feet, or something like that, south of the crossing; that he noticed the saw and bundles probably 20 or 30 feet south of the sidewalk; that the body was further south; that he examined the crossing, but did not find any break or tear in it; that he could not notice any holes in the crossing; that he attempted to put his heel between the west rail and the planking on the street, that he could not get it in except lengthwise; that he wore a six shoe; that he could not swear positively, but that he thought that the bell was ringing; that it was a clear day.

The witness Sloge testified that he came to Grafton about the 1st of November; that he was a claim agent of the company; that he measured the distance between the west rail of the elevator track and the plank with a metallic tape, and found it to be $2\frac{1}{2}$ inches; that he measured it at the south edge of the planking and back a little from the south edge.

So far the testimony is undisputed that the accident did not occur on

the sidewalk at all, but south of it; that there was no defect in the sidewalk, and that the deceased carelessly walked in front of the moving train.

We have now to determine whether the testimony of the plaintiff's witnesses furnishes any evidence which could have been submitted to the jury. The first witness, Severt Severtson, does not pretend to know anything about the accident or to have seen the same, but testifies merely as to the earnings of his brother,—his monetary value. The second witness, Frank Jestrand, is the only witness who saw the accident. He is a farmer, sixty-eight years of age. He testified that at the time of the accident he was 150 feet south of the crossing on Fifth street, the railroad running north and south; that it seemed to him there was a train on the north side of the depot and one on the south side of the depot; that the train on the north of the depot was standing still; that he observed the deceased approaching the crossing going in an easterly direction; that as the deceased was coming along, he (the witness) was going north to the lumber yard; that as he (the deceased) was coming east the train was standing north of the street line and he saw the man on the track; that he noticed he was jerking his foot trying to get loose; that he saw the man trying to jump, his left foot was caught or tied down by something. He tried to hop around and jerk his foot four or five times; that if he had his foot tied down he could illustrate how it was. "The left foot was caught. He was facing north toward the cars. Nobody was on the car. It was in plain view of me. I saw the fireman and engineer in the cab. They were north from this man about the length of one car. I am trying to tell what I saw. I saw him trying to get loose, and when he could not get loose he lifted up his hand a way and put it against the car after the car came close enough. He had something in his hand. It looked like a tin pail, but I could not say, and the car was coming onto him all the time, and he did not get his foot loose and the car pitched him over—side-face down like. I was probably 150 feet away. I did not know whether the train did or did not stop but kept right on. It stopped pretty nearly opposite me when it got 150 feet further south. He was close to the west rail when he raised his hand up when the car was approaching. I was facing north and the train came pretty slow, maybe a mile an hour. I did not see anybody there at the crossing. I was coming down town to the lumber yard. I

crossed the street on the south side of the depot and went north. I turned into that vacant space on the south side of the depot. My horses were walking. I was in a lumber wagon and high box. When I first saw Severtson he was about half way between the hotel and the tracks. That would be about 15 or 20 feet from the track. This train was on the south side of the depot. I was standing north of the depot,—north of Fifth street. It must have been right on the street, I do not know how far. I do not know how far the train was north of the street when I first saw it. I think it was past the Fifth street crossing. It was standing on the west track. The train that I saw was standing still. I would not swear that there was only one train to the north, but there was only one or two trains, and I know that there was one positively. The train I saw was standing still. I first noticed the train move when I was about 150 feet from it. It was not moving when I first saw it. I know when it started moving first. When the steam escaped from the cocks you could tell by the exhaust, and that is what I base my judgment on as to the time when it started to more. I did not notice whether the man walked or limped. When I first saw him he was about 15 or 20 feet from the track. The train did not move when I saw this man first. He was right on the track when I noticed the train started to move. The train was standing still when Mr. Severtson was 15 or 20 feet from the crossing."

"Q. Which did you watch, Mr. Severtson or the train?

"A. I watched the man coming across the street, but I lost sight of him. I did not pay any attention to him until I saw him in line with the cars.

"Q. After you saw him about 15 or 20 feet from the cars, I mean the track, you looked up to see the train, and the train had just started to move at that time, is that right?

"A. No, I just noticed the train had started to move about the same time Mr. Severtson tried to get loose from the spot where he was fast. I could not see how far he was from the sidewalk. No, because it was in line north from me, and I was looking straight at it. It was probably ten seconds after Mr. Severtson got onto the track before the train struck him, if not more. I was watching to see if somebody was not going to pull him off. Mr. Severtson was on the south side of the street. He was not walking in the middle of the road.

` "Q. Do you know if he was walking on the sidewalk or in the open space you came through?

"A. No, he was walking on the sidewalk. There was no men on the train that ran Mr. Severtson down, I mean on the end of the car.

"Q. You would not say there was not a man on the east side of the car?

"A. I am telling you I could see it as long as the train did not block it like, or the cars.

"Q. You do not want to tell us you could see through that box car or see the east side?

"A. No, I said I could see the East side until the car blocked the view.

"Q. How much of that east side of that car could you see?

"A. If I was a good way north I could see a good way east. I was to the west and south of this track at that time. I did not notice any planks torn or any place where a man's foot could have been caught. I believe it was kind of foggy. I could see all right. I had no trouble at all in seeing. I could not have seen anybody get off that train on the east side. I was about 30 feet west of the track. The angle of vision on the line measuring from where I stood would be about straight."

The witness De Puy testified for the plaintiff that his attention was called to the accident shortly after it happened; that he went down and made observations; that he made measurements; that on the day following the accident he saw marks or indications as to whether or not a man had been caught there between the rails and the plank—between the rails and the planking of the west track—next to the inside of the west rail. It would be on the sidewalk if the sidewalk extended between the rails. It was not a part of the wagon road part of it. The planks between the rails run parallel with the rails and between the rails, and on the west side there was a space of a trifle over $2\frac{1}{2}$ inches. The top of the plank next to the west rail, about from 1 foot to 18 inches north of the south end of the plank, on the west edge of the plank and at the upper surface of the planking there was an abrasion, or a mark in the wood, and there were some small slivers from the edge of the plank at the point of this abrasion that were lifted up from the edge of the plank, at the end of the planking, probably 2 feet. "Now I wish to describe what I saw on the day of the accident. The day of the acci-

dent, and shortly after 12 o'clock I saw on the ground between the ties a mark. This mark would be located probably 2 feet east of the west rail of this west track at a point from 16 to 18 inches south of the south end of the planking. The marks on the ground at the north end were rather shallow. The mark was about the length of a man's shoe, about 8 or 9 inches long, east and west. This mark ran away from the plank for approximately a foot and a half, perhaps not that far, maybe 14 inches. It ran in a southerly direction, starting, as I say, very shallow and running down deeper until it was considerably over an inch or two. It was just such a mark as a person's foot would make if it scraped along the ground. I would imagine, but I would not be prepared to testify to that now, that there is a planking about 20 feet long running in the center of the street where the teams go. All I inspected was the extension of the sidewalk. I found the distance between the west rail and this extension of the sidewalk to be a trifle over $2\frac{1}{2}$ inches. I measured it in two or three places. The planking next to the rail was not worn off very much. The west plank between the rails of the particular crossing in question was distant $2\frac{9}{16}$ inches—about $2\frac{1}{2}$ inches from the inside surface of the rails. The upper surface of the planks at the point where I measured were about $\frac{5}{16}$ of an inch below the upper surface of the west rail."

Ole Hanson testified that one leg was broken about the ankle and the other was crushed over the heel. The heel was crushed. It was the left foot that was crushed at the heel. Severtson had coarse working shoes on. The shoe on the left foot appeared as if something heavy had struck it at the point near the small toe, and it was cut right up behind the heel there. A part of the leather was cut through. It looked as if it had been torn. The heels were on both shoes, and, on the leg where the shoe was not torn, the leg was broken just above the shoe top.

In addition to this testimony, and having immediate bearing on the question before us, is the testimony of the witness Hollie Hanson, who testified:

I was at my elevator at the hour of the accident. I was painting the casing of the east window in the office. I was on the inside of that building. The window that I was painting was at the east end near to the track, that is, within 5 feet of what is known as the passing track. I

never measured it. I am giving my best judgment. I was facing the window. I heard someone hollering. Just previous to the time I heard this hollering I had seen a train on that track.

Q. Did you see a particular car on that track?

A. I did. It was a gondola. It was opposite the window. *It was standing still. Just previous to the time that I heard this hollering it started to move south before I heard the hollering. It was probably a minute or a minute and a half before I heard this hollering that it started to move south. Just a very short time before. Then I heard the hollering.* When I first heard it I did not pay much attention to it, but the second time I heard them cry, "There is a man under the car," and then I ran out. I went out into the street, and I seen Mr. Jestrand pointing toward the train, and as other parties went over to the train I followed over. I was among the first to get there.

Q. Did you see a saw or any parts of a saw?

A. I did. *I saw the blade and a part of the woodwork.* The blade was detached from the woodwork. *It was on the east rail lying crosswise south of the crossing about 3 or possibly 3½ feet,* I would imagine. Not to exceed 3½ feet. I afterward looked at the crossing.

Q. Did you see any mark or marks on the west edge of the west plank of this particular crossing?

A. Yes, sir. There was a dent in the planking with slivers. The saw was lying across the east rail. *The gondola car stopped while in front of my window. I could see the wheels of the car. They were not going around. The car was standing still.* I saw the hind wheels of the tender and the front wheels of the gondola. I did not see this bread and saw and things when I first came out. I took particular notice of the bread first when I had gotten between the crossing and the east passing track. It was between the east rail of the elevator and the south rail of the main track, and about 10 or 12 feet south of the sidewalk. The bread and the blade of the saw were not in the same place.

Q. Was the rest of the saw down there where the bread was?

A. Pieces of it. The blade of the saw was lying across the east rail. I did not measure the distance. I did not step it off. I am just giving by judgment. *I examined the crossing after the train had pulled off. It was slivered a little. I saw the slivers on the west plank near the*

*east rail at the south end, at the south edge of the plank—at the west end I believe.*

Q. Right in the corner of it?

A. No, on the west side of the edge of the west side.

Q. What kind of a sliver was it?

A. It was just like anything had been pulled across there and pulled out. The pail was between the rails right underneath one of the trucks of the car, in the neighborhood of 10 feet from the crossing. I would judge. The blade of the saw was between 3½ and 4 feet from the crossing, but it would not be more than 4 feet. I never stopped to measure it.

In addition to this, and as tending to show that the train stopped immediately before the accident, and that the brakeman on the train saw the deceased approaching the track and within 15 feet of it, even though not upon the sidewalk, and immediately before the accident, we refer again to the testimony of the brakeman Koochenberger in which he says:

I got into the gondola car about 200 feet from the mill track or mill spur and about a block from the Fifth street crossing. I got on the rear of the tender. There was a stop sometime after I got into the car. I stepped into the car and walked toward the center of it,—walked toward the engine in coming out on the mill-track spur. I was doing nothing but looking out to see that nobody got hurt. I looked out. I stayed on until we backed over the crossing, and then I had no more right to be on there, because the crossing was blocked. I then got out of that car, on the east side of the car and on the south end of the car. I then walked up toward the engine to relay signals. I walked north across Fifth street.

Q. You say you got down off this car just as the end of the gondola went over the crossing—I mean over the street?

A. It practically stopped. It stopped at the switch.

Q. Did you just clear the street?

A. It blocked the crossing but it was over about a car length, I should judge.

Q. After you got down did you see Mr. Severtson?

A. I did not know it was him, but I would judge it was because of the bundles I picked up afterwards. I think it must have been him.

Q. Where was he when you saw him at that time?

A. I could not state the exact distance, but I would judge about 15 feet from the passing track in a south direction of that sidewalk. He was not near the sidewalk. He was not on the sidewalk. There was only one girl on the sidewalk. It was a clear day. I had no trouble in seeing. The bell was ringing. The gondola car is 36 feet long. It was a combination flat car or one we put sides onto. The sides were about 3 feet, 6 inches, I would judge.

On cross-examination he said:

I stayed on the car until it passed this clear up to Fifth street. I got onto the car and walked to the south end. I stayed on it. I did not get off until it stopped over the crossing. I was with the train when it backed down to the Fifth street crossing all the while. I saw a man that I took for the deceased over in this district. Well, I took it to be that man. The train was backing south.

Q. Was he in your line of vision from that time?

A. After I got off the car it was impossible to see anybody. I got off the car on the east side of the right-hand side. I then walked up toward the engine figuring on relaying signals.

Q. After you did that when did you first find out a man had been killed on the crossing there?

A. After I came back to see what the engine had stopped for. It was my first intimation that I had killed somebody.

Q. The four marks that you made here is where you observed the man going toward the crossing?

A. I would judge. I do not know that he went to the crossing.

Q. Was he going fast or slow?

A. Slow.

Q. And that was all that you saw until you found out somebody was killed?

A. I observed different people on the right of way.

Q. And that was all that you had seen of this man?

A. Yes, sir.

Q. When did he disappear from your vision?

A. When I got off from the car.

Q. And you got off the car where?

A. Right over the crossing.

At the close of the testimony the trial judge directed a verdict for the defendant, saying: "The question for us to consider is whether this view of the case was correct, or whether there was not some creditable evidence in the record which would leave the matter for the consideration of the jury and not of the court." The theory of the trial judge evidently was that the witness Jestrand was not in a position to be able to judge in any way as to where the plaintiff's intestate was at the time of the accident, or as to whether the train was moving or not before the deceased got upon the track, and that the evidence is conclusive that the deceased was not injured upon the sidewalk at all; that he therefore could not have gotten his foot caught in the sidewalk; that the evidence showed that the deceased had a marked peculiarity in his walk; that the witness Jestrand must have based his conclusion that he was caught, on the fact that he saw him kick out his foot, and which kicking was occasioned by the peculiarity mentioned. He also seems to hold that the evidence shows conclusively that the deceased was guilty of contributory negligence, and this no doubt largely upon the assumption that the deceased was south of the sidewalk and was therefore a trespasser.

There is in the evidence much in support of this view of the case, yet we cannot refrain from holding that the matter was one for the jury, and not one for the court. The witness Jestrand was only 150 feet from the crossing. It was a clear day. He was 30 feet from the track so that his angle of vision was different from what it would have been if he had stood straight in front of the approaching engine. It is quite clear to us that a man standing at that distance from an engine could tell whether it was moving or not, and it is also quite clear that he could see if a brakeman was at the end of the car and even on the side opposite from him and looking around the end of the car. It is also quite clear to us that he could approximate in a measure the speed of the train and could tell when that train started to move. He testified positively that the deceased was caught in the track before the train started to move, and that it was standing still a few moments before the accident. The testimony of the witness Hollie Hanson is that he himself was within a short distance of the track, immediately west of the same, and that before the accident the train was standing still opposite the window which he was painting. If this was the case the train was on or near the street and standing still just prior to the accident, and

this testimony and the testimony of Jestrand positively contradicts the testimony of the defendant's witnesses that the train did not stop after leaving the mill track. There is also evidence in the record given by the witness Hanson that the blade of the saw was found within 3 or 4 feet of the sidewalk and to the south of it. This is clearly consistent with the idea that deceased when injured was on the sidewalk or very close to it. There is also some evidence that there were indentations in the boards, and evidence that something that might very well have been the heel of a shoe had been dragged along and crushed into the same. There is, it is true, no positive evidence that the railway company was negligent in the construction of the crossing. The evidence, in fact, shows that the distance between the rail and the planking was approximately the legal distance of $2\frac{1}{2}$ inches. There is also evidence that the deceased wore a number ten shoe, and testimony that the heel of a number ten shoe would not go into a space of $2\frac{1}{2}$ inches if the wearer was walking straight across the track. It is a matter of common knowledge, however, that the heels of even number ten shoes vary greatly in size, and that the size of the shoe is really no indication of the size of the heel, and there is no proof in the evidence of the actual size of the heels of the shoes worn. It is also a matter of common knowledge that the heels of shoes, except perhaps rubber heels, are longer than they are broad, and it is by no means improbable that the deceased caught his foot lengthwise in the track rather than crosswise. The tendency of the deceased to kick his foot out to the side would, in fact, suggest this idea. There is evidence, also, that the rail of the track was raised above the sidewalk some $\frac{7}{16}$ of an inch, while the statute requires it to be level. This difference, we know, is trifling, but it is great enough so that it might obstruct the sole of a worn shoe. It is quite probable, indeed, that the combination of the raised rail, the lameness of the deceased, and the distance between the rail and the planking, occasioned the deceased to be caught therein. It is by no means improbable, also, that even if the deceased was not on the sidewalk, he from fear, lameness, or some other reason had been delayed while on the track and rendered unable to move, and the evidence of the witness Jestrand is positive that immediately prior to the accident the deceased was trying to get loose from the spot where he was fast; and that he (Jestrand) was watching to see if somebody was not coming to pull him off.

Even if this evidence does not show that the railway company was negligent in the construction of its crossing, it does tend to show that immediately prior to the accident the deceased was caught in the track, and that in spite of that fact, and while he was within a short distance of the train, the train was started and pushed against him. The evidence of the plaintiff also tends to show that no lookout was kept, and it must be apparent to everyone that if the engineer or brakeman had looked ahead, or a proper lookout had been kept, the man must have been detected in his perilous position.

It is of course well established, that in a case of this kind we cannot be governed by the mere preponderance of the evidence, or by what our verdict would be if we ourselves were sitting upon the jury, but whether there was sufficient evidence to go to the jury at all, and we are not allowed to ignore the evidence of the plaintiff unless the physical facts make it absolutely unbelievable. Such being the case, we cannot refrain from holding that the matter was one for the jury, and not one for the court to pass upon. We realize that the doctrine of the scintilla of evidence has been abrogated in this state, but we have more than a scintilla.

We are not prepared to say that if, as plaintiff's witnesses testified, the train was standing on or near the street, with the front of the engine pointing northward, it was contributary negligence as a matter of law for the deceased to have walked around it to the south. A railway company has no right, when it stops a train upon a public street of a city, to start it without giving ample warning and acquainting itself with the fact as to whether there are any travelers who are liable to be in danger. So, too, though the deceased may have been walking some few feet south of the sidewalk, and though technically speaking a trespasser, we cannot say that this act was negligence which contributed to the injury, as he would have been none the less in danger if he had been walking upon and had been caught upon the sidewalk.

It must be remembered that, according to the witnesses mentioned, the train was standing in the street or just beyond it. It was the duty of the company to keep a lookout for travelers. It was its duty not to start the train until it had ascertained that no one was in the danger line. If it had done this it must have seen the deceased even though he was walking some few feet south of the sidewalk. It is really immater-

ial, indeed, whether he was caught on the sidewalk or whether he was caught at all, as, according to the witness Jestrand, he was detained and struggling in the middle of the track before the train started, no matter from what cause. It is not necessary, under the decisions as we view them, that the defendant in such a case should actually have seen the injured party. It is sufficient that it should have seen him.

It seems to be clear from the testimony of the brakeman Koochen-becker that he saw the deceased when he was near the track. It is clear that if he had looked he would or should have seen him, and it was for the jury to say from the evidence in the case whether the deceased was caught in the track; whether the train was started after such fact, and whether, under the circumstances, the defendant was negligent in starting and operating its train. It was, in fact, for the jury to say whether the train, as testified to by the witnesses Jestrand and Hanson, and even hinted at by the witness Koochenbecker himself, stopped before making the crossing, and whether the plaintiff's intestate was seen or should have been seen approaching the track and about to cross the same, and whether he was caught or delayed in the track before the train started, and whether, in short, by the exercise of due care the accident could have been averted. Whether he himself was guilty of contributory negligence, too, was a matter for the jury to pass upon. We cannot say as a matter of law, indeed, that a railway company which has stopped its train near to or upon a public crossing can start the train without using proper precautions to warn and protect one who has been seen approaching its tracks and about to cross, and can escape liability for the reason that when crossing the same the deceased walked a few feet south of the sidewalk and off the regular highway, and, for all that we know, did so in obedience to the very natural instinct of getting as far away as possible from a danger-ous object which at any time might, by carelessness or other means, be put in operation.

The judgment of the District Court is reversed and a new trial is ordered.